*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

LAMONN KNOTT,

      Defendant-Appellant.

UNPUBLISHED
March 10, 2020

No. 341418
Wayne Circuit Court
LC No. 16-007429-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

SCOTT ROSEAN ODUM,

      Defendant-Appellant.

No. 341969
Wayne Circuit Court
LC No. 16-007429-02-FC

---

Before: K. F. KELLY, P.J., and TUKEL and REDFORD, JJ.

PER CURIAM.

In Docket No. 341418, defendant, Lamonn Knott, appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, felon in possession of a firearm (felon-in-possession), MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, second-degree arson, MCL 750.73(1), and mutilation of a dead body, MCL 750.160. Knott was sentenced as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without the possibility of parole for his first-degree premeditated and felony

-1-

murder convictions, [1] 15 to 30 years' imprisonment for his armed robbery conviction, 15 to 20 years' imprisonment for his felon-in-possession conviction, 10 years' imprisonment for his felony-firearm conviction, 15 to 25 years' imprisonment for his second-degree arson conviction, and 15 to 20 years' imprisonment for his mutilation of a dead body conviction.

In Docket No. 341969, defendant, Scott Rosean Odum, appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), armed robbery, MCL 750.529, felony-firearm, MCL 750.227b, second-degree arson, MCL 750.73(1), and mutilation of a dead body, MCL 750.160.[2] Odum was sentenced as a third-offense habitual offender, MCL 769.11, to life imprisonment without the possibility of parole for his first-degree felony murder conviction, 20 to 40 years' imprisonment for his armed robbery conviction, two years' imprisonment for his felony-firearm conviction, 20 to 40 years' imprisonment for his second-degree arson conviction, and 10 to 20 years' imprisonment for his mutilation of a dead body conviction.[3] We now affirm both defendants' convictions but remand to the trial court for the limited purpose of entering amended judgments of sentence clarifying the underlying felony for which Odum must serve his consecutive sentence and to reflect that Knott was convicted of one count of first-degree murder based on two theories and only one sentence to one term of life imprisonment without the possibility of parole.

## I. BASIC FACTS

On April 7, 2016, Knott contacted the victim about purchasing a large amount of marijuana. Knott and the victim spoke by cellular telephone several times throughout the day, and Rachel Karas, the victim's girlfriend, testified that the victim left their shared home during the evening hours to meet Knott to complete the sale. The victim took with him nearly $12,000 in cash, several pounds of marijuana, and a wristwatch when he left. Cellular telephone tower tracking showed that the victim was heading toward 9558 Ward Street, an area in which Knott's cellular telephone also was pinging. The last conversation the victim had on his cellular telephone was at 6:21 p.m., during which he called Knott. After hanging up, Knott immediately

---

[1] Although the jury convicted defendant of two counts of first-degree murder arising from a single death, the parties do not challenge the convictions and sentences for both offenses. However, as our Supreme Court has held, Knott's conviction should be for one count of first-degree murder based on two theories, with only one sentence for life imprisonment without the possibility of parole. To do otherwise, as the trial court did here, is a violation of Knott's constitutional protection from Double Jeopardy. *People v Williams*, 475 Mich 101, 103; 715 NW2d 24 (2006) ("[T]o avoid double-jeopardy implications, the defendant receives one conviction of first-degree murder, supported by two theories . . . ."). Consequently, although not raised by Knott on appeal, we remand to the trial court to correct the judgment of sentence. *Id.*

[2] Odum also was charged with, but ultimately acquitted of, first-degree premeditated murder, MCL 750.316(1)(a), and the crime of felon-in-possession, MCL 750.224f.

[3] Knott and Odum were tried together but with separate juries, and we consolidated their appeals "to advance the efficient administration of the appellate process." *People v Knott*, unpublished order of the Court of Appeals, entered January 24, 2018 (Docket Nos. 341418 and 341969).

called Odum six consecutive times before Odum finally answered on the seventh call. Odum's cellular telephone also pinged the sector of the tower covering the crime scene. The cellular records then showed that for about one hour neither Knott's, Odum's, nor the victim's cellular telephones connected to a tower. Special Agent Stan Brue, who was qualified to testify as an expert witness in the field, stated that this likely indicated that all three telephones were powered off.

About one hour after the telephones stopped connecting to any tower, security camera footage from a Citgo gas station just a few blocks from 9558 Ward Street showed Knott and Odum walking toward the store. They entered the gas station, got in line, and began a conversation. During that conversation, Knott and Odum gestured toward an area behind the cash register where the gas station kept the gas cans it sold. Initially, Odum purchased a pack of cigarettes and walked out of the store with Knott, but then they stopped, spoke for a moment, and Knott walked back into the gas station. Odum continued across the street, toward a liquor store and 9558 Ward Street. Knott, once back inside the gas station, purchased two gas cans. He then took those gas cans outside to a pump and filled them with gasoline. Afterward, Knott walked away in the same direction as Odum.

About 35 minutes after Knott left the gas station, a 911 call reported a fire at 9558 Ward Street. The victim's body was discovered inside the home by the fire department. He had been shot a total of five times, twice in the face, twice in the head, and once in the chest. His body and some of the house also had been burned. The arson investigator concluded that the fire was started in multiple locations with the use of an accelerant. Two gas cans were found in the kitchen of the house at 9558 Ward Street. Those gas cans were the same brand and model as those purchased by Knott from the Citgo gas station.

On May 26, 2016, police officers arrested Knott and Odum. During his interview, Knott denied ever being in the area of the crime on the day in question. He refused to admit that he was the man in the gas station surveillance footage and said that he did not know Odum. Initially, Odum also denied being in the area of the crime on the day in question, but when presented with the gas station footage, he immediately admitted that it was him and Knott. Odum stated that he had known Knott since childhood. Odum continuously changed his story to police as he was confronted with more evidence against him. Ultimately, Odum and Knott were tried together before separate juries, convicted, and sentenced as noted. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Both Knott and Odum argue that there was insufficient evidence to sustain all of their convictions. We disagree.

## A. STANDARD OF REVIEW AND GENERAL LAW

An appellate challenge to the sufficiency of the evidence is reviewed de novo. *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016). To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, the appellate court examines the evidence in the light most favorable to the prosecutor to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *People v Smith-Anthony*, 494 Mich 669,

676; 837 NW2d 415 (2013). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks omitted).

"The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

## B. IDENTITY

Although Knott and Odum challenge the sufficiency of the evidence pertaining to all of their convictions, their argument on appeal, but for two specific exceptions, is that there was insufficient evidence to establish their identities as the perpetrators. In other words, defendants do not dispute that the victim was robbed, murdered by someone who possessed a gun and shot him, and then partially burned in a dwelling. Rather, they merely argue that there was a lack of evidence that they were the ones who committed those crimes. "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime," and that "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). A perpetrator's identity can be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016).

## 1. EVIDENCE OF KNOTT'S IDENTITY

Knott's argument on appeal focuses on the lack of direct evidence that he was the person who committed the robbery, murder, and subsequent burning of the victim. As noted, however, identification of a defendant as the one who committed a crime can be established solely by circumstantial evidence. *Id.* In this case, the prosecution presented an abundance of circumstantial evidence that Knott committed the crimes in question. Knott admitted in his interview with police that he knew the victim for many years. Knott acknowledged that, at some point in the past, he and the victim worked together selling marijuana. On the day in question, Karas saw that Knott called the victim. She believed that Knott requested to purchase marijuana, which comports with Knott's own description of his relationship with the victim. Similarly, Justin Covent, the victim's friend, knew that the victim and Knott were sometimes in business together, and that on the day in question, the victim was seeking marijuana to sell to Knott. Both Karas and Covent understood that when the victim left their presence he was on his way to meet Knott.

Knott's and the victim's cellular telephone records further confirm that the two were speaking on the day of the crime. The records show that they spoke on numerous occasions between 4:00 p.m. and 6:21 p.m. Those same records also place Knott in the area of the crime scene beginning at 5:53 p.m., and show that the victim was traveling toward the crime scene at least by 5:56 p.m., because his cellular telephone pinged a tower between his home and the scene of the crime. According to the cellular telephone records, the victim continued to move toward the crime scene, because at 6:08 p.m., his phone pinged a tower even closer to the crime scene. For that call, the victim spoke with Knott, who again was in the vicinity of the crime scene. Following that conversation, Knott then called Odum six times in a row, all of which went to voicemail. When Knott finally reached Odum, both of their cellular telephones pinged the tower in the area covering the crime scene. Shortly thereafter, at 6:21 p.m., the victim called Knott a final time, during which the victim's cellular telephone pinged the tower immediately next to the crime scene, and Knott's cellular telephone pinged the tower for the crime scene. From that evidence, a reasonable juror could infer that Knott had contacted the victim, asked the victim to meet him on Ward Street in Detroit, and then enlisted Odum's help to eventually rob and murder the victim.

Agent Brue testified that the evidence indicated that all three cellular telephones were pinging off of towers near the crime scene and then likely were powered off. Thus, the evidence supported the inference that the three men were together because their phones were all pinging near the same location, and then all had their telephones powered off. Accordingly, Knott had the opportunity to commit the crimes and "[e]vidence of opportunity is logically relevant in a prosecution for murder." *People v Unger*, 278 Mich App 210, 224; 749 NW2d 272 (2008).

The circumstantial evidence supporting those inferences was further bolstered by the gas station surveillance camera footage. The footage showed that at about 7:17 p.m., Knott and Odum arrived at a Citgo gas station located just a few blocks from the scene of the crime. They arrived on foot, walked into the store, and pointed toward an area behind the cash register where gas cans were sold. Odum then purchased cigarettes and walked outside and off toward the crime scene. Knott went back into the store, purchased two gas cans, went outside to a pump, filled those gas cans with gasoline, and then walked off in the same direction as Odum. After about 35 minutes, someone called the police regarding a fire at the scene of the crime. When police and firefighters arrived to investigate, the victim's body was found. He had been shot five times, his front left pants pocket had been turned out, his wristwatch was missing, there was no marijuana or cash in the house, and his body had been partially burned. The police also found two gas cans in the kitchen of the partially burned residence. Police investigation later determined that those gas cans were the same brand that was sold at the Citgo gas station. The arson inspector determined that the fire was set on purpose, one of the sites of origin was the victim's body, and that an accelerant—gasoline—was used.

Later, during a conversation with Karas, Knott acknowledged that he planned to meet with the victim on the day of the crime, but stated that the victim did not show up. Then, during his police interview, Knott denied being in the area of the crime and claimed that he had not spoken to the victim since March. His representations to police contradicted his Facebook conversation with Karas. Also, during his interview, Knott refused to identify himself in the gas station surveillance footage, only agreeing that the man looked like him. Yet, about one year after the crime, in March 2017, Knott told a private investigator hired for his defense that the gas

cans he purchased in the surveillance footage were in a garage owned by his family on Glastonbury Street in Detroit. Therefore, Knott tacitly admitted to being the man in the video, despite repeatedly denying it and claiming he was nowhere near the area of the crime scene on the day in question. "Conflicting statements tend to show a consciousness of guilt, and a jury may infer consciousness of guilt from evidence of lying or deception." *People v Dixon-Bey*, 321 Mich App 490, 509-510; 909 NW2d 458 (2017) (brackets, citations, and quotation marks omitted).

In summary, Knott knew the victim, purchased and sold drugs with the victim in the past, was in contact with the victim on the day of the crime, was the last person to speak to the victim, was in the same vicinity as the victim, had his cellular telephone turned off at the same time as the victim, purchased gas cans and gasoline near the scene of the crime less than an hour before a fire was reported, lied about being in the area of the crime scene, and lied about being the man purchasing gas cans in the surveillance video. As noted, Knott's identity as the perpetrator could be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *Bass*, 317 Mich App at 264. Further, it is the function of the jury to make those inferences on the basis of the evidence presented, and it is not for this Court to "resolve anew." *Davis*, 241 Mich App at 700. The jury considered the evidence, circumstantial though it might have been, and determined that Knott was the person who lured the victim to the house on Ward Street, robbed him, killed him by shooting him five times, and then attempted to burn his body and the house by using the gasoline he purchased just down the street. As established, those inferences by the jury were supported by Knott's clear opportunity to commit the crimes, *Unger*, 278 Mich App at 224, and the fact that he lied about his whereabouts and his identity in the surveillance video, *Dixon-Bey*, 321 Mich App at 509-510.

Accordingly, the inferences made by the jury in establishing Knott's guilt were well-founded. There was abundant circumstantial evidence that supported Knott's identity as the perpetrator of the crimes in question because "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich at 428.[4]

## 2. EVIDENCE OF ODUM'S IDENTITY

As argued by the prosecution, Odum was convicted on an aiding and abetting theory. "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed

---

[4] To the extent that Knott argues that the evidence actually supports that it was two other men instead of he and Odum that committed the crimes, we find that argument unavailing. See *People v James*, 327 Mich App 79, 87; 932 NW2d 248 (2019) (quotation marks omitted). ("Even in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but need merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide.").

such offense." MCL 767.39. "The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *Henderson*, 306 Mich App at 10, quoting *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004).

Odum's role in the case is directly connected to Knott's actions, which were just discussed in detail. Knott spoke with the victim several times during the day, and the cellular tower data revealed that the victim was traveling toward the crime scene at approximately 6:00 p.m. When the victim and Knott spoke for the last time at 6:21 p.m., Knott's cellular telephone was pinging the tower for the crime scene and the victim's cellular telephone was pinging the tower directly next to the scene. Within moments of finishing that call, in the span of just two minutes, Knott called Odum six times in a row. Odum finally answered on the seventh call, and the two had a short conversation during which both of their cellular telephones pinged the tower for the crime scene. As discussed, a reasonable juror could infer that Knott was luring the victim to the house on Ward Street on the premise of conducting a marijuana sale, when he actually intended to rob and kill the victim.

Similarly, a reasonable juror considering Odum's case could have inferred that Knott called Odum so that the two could prepare for the victim's arrival. This inference is supported by the timing of the call, considering that Knott would need to inform Odum that the victim was nearly at the house on Ward Street, given that the victim's cellular telephone pinged a tower next to the scene. The jury also could infer that Knott's attempts to contact Odum were urgent because he called him seven straight times within the span of just two minutes. The urgent matter, a reasonable juror might infer, was the plan to rob and kill the victim, whom Knott knew was carrying a combination of cash and a large amount of marijuana.

Although, as noted by both defendants, the cellular tower data cannot definitively place Odum and Knott together or at the exact scene of the crime, a juror could reasonably infer that they were together at the time the crime occurred. Joe Osborne III, who lived on Ward Street at the time of the crime, gave a statement to police that he saw two men at the scene of the crime at about the time the crime occurred. Considering the abundant circumstantial evidence establishing that at least one of those men was Knott, lying in wait for the victim's arrival, a reasonable juror could infer that the second man was Odum on the basis of his cellular tower pings and his contact with Knott. Despite Osborne's trial testimony that he could not identify either defendant, this Court must assume that the jury made all credibility determinations in favor of the prosecution. *Henderson*, 306 Mich App at 9.

A reasonable juror also could infer that Knott and Odum were together shortly after they spoke on the telephone at about 6:23 p.m., because they appear on camera together at the Citgo gas station beginning at about 7:17 p.m. They arrived together walking from the direction of the crime scene. It was reasonable to infer that because they spoke on the telephone, both of their cellular telephones pinged the same tower, and they arrived at the Citgo gas station together, that they had been together from 6:23 p.m. onward.

The circumstantial evidence provided by the prosecution not only allowed for an inference that Knott and Odum were together, but that they committed the crime together. On the basis of the same evidence previously noted, the jury was permitted to infer that Odum spoke

with Knott about the victim's imminent arrival at the house on Ward Street and their intent to rob and kill him. The circumstantial evidence also suggested that Odum went to the Citgo gas station to assist Knott in covering up the crime after it already was committed. Although Odum argues that the Citgo footage only shows him purchasing cigarettes and not gas cans, the footage also shows Odum and Knott talking while in the gas station and pointing behind the counter toward the area where gas cans are kept. Despite the fact that Odum left the gas station before Knott purchased and filled the gas cans, Odum did walk off toward the crime scene, and as is visible on the cameras, he appears to have walked past the liquor store across the street. Then, when Knott finished filling up the gas cans, he carried them off in the same direction that Odum went—toward the crime scene.

In considering that evidence, the jury reasonably inferred that Odum and Knott were working together to burn the house on Ward Street and the victim's body. When a person participates in actions performed to cover up a crime after it was committed, a jury is permitted to infer that the person aided and abetted the commission of that crime. See *People v Akins*, 259 Mich App 545, 555-556; 675 NW2d 863 (2003). Thus, Odum's clear involvement in the cover up of the crimes—going to the gas station with Knott to buy gas cans and gasoline—was evidence that he also participated in the crimes. *Id.* Moreover, the purchase of the gas cans, which the jury was well-supported in inferring were the same gas cans found in the kitchen of the house on Ward Street, indicates that Odum was involved in burning the house—second-degree arson—and the victim's corpse—mutilation of a dead body.

Additionally, Odum repeatedly lied during his interview with police officers, lending further support to those inferences. The jury saw the interview video, and in it, Odum first denied that he was in the area of the crime scene on the day in question and that he was with Knott. Rather, Odum recalled that he was helping a friend move to an area that was not near the crime scene or the Citgo gas station. When the police presented him with the photographs from the Citgo surveillance cameras, Odum acknowledged that the men in the video were him and Knott. When informed by police that the video was taken at the time Odum was allegedly moving his friend, Odum began to change his story. For the first time, he said that he had to pick up another friend to help move and that friend lived near the scene of the crime. When the police pressed Odum on why he walked to the gas station with Knott, Odum changed his story again. This time, he said that he had met Knott at a local Family Dollar store because Knott had called him about his vehicle running out of gas. He stated that he and Knott then walked to the Citgo to get gasoline for Knott's car. Despite that testimony, Odum still claimed that he also moved his friend that same day and left the area shortly after the gas station footage ended. When presented with the cellular tower data which indicated that his cellular telephone was pinging the tower nearest the crime scene until well after 8:00 p.m., Odum was unable to explain the discrepancy. In sum, Odum continued to change his story to a version that was most beneficial to him as he was presented with more evidence of his involvement in the crimes. "Conflicting statements tend to show a consciousness of guilt and a jury may infer consciousness of guilt from evidence of lying or deception." *Dixon-Bey*, 321 Mich App at 509-510 (brackets, citations, and quotation marks omitted).

Finally, the prosecution presented evidence that, within 35 minutes of Knott leaving the Citgo station with cans of gasoline and walking in the same direction as Odum, someone called police regarding the fire at the crime scene. A reasonable juror could infer that Knott and Odum

went back to the crime scene—their cellular telephones were still pinging in that area after the fire was called in—and worked together to burn the house and the victim's body. In sum, on the basis of the significant circumstantial evidence presented, the inference of a guilty conscience from Odum's lies to police, the cellular telephone analysis, the video footage showing Odum and Knott gesturing to the gas cans and the purchase of gasoline, and our requirement to construe all evidence in the light most favorable to the prosecution, the jury had sufficient evidence to find beyond a reasonable doubt that Odum aided and abetted Knott's commission of all of the crimes for which Odum was convicted. *Smith-Anthony*, 494 Mich at 676; *Dixon-Bey*, 321 Mich App at 509-510; *Akins*, 259 Mich App at 555-556.

## C. PREMEDITATION

Knott alternatively argues that there was insufficient evidence to convict him of first-degree premeditated murder because there was no evidence of premeditation. We disagree.

"A conviction of first-degree premeditated murder requires evidence that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (citations and quotation marks omitted). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *Id*. (citations and quotation marks omitted). Stated differently, "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003) (brackets and quotation marks omitted). "The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." *People v Oros*, 502 Mich 229, 244; 917 NW2d 559 (2018) (quotation marks omitted). Our Supreme Court has held that "what constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict." *Id*. at 243-244. "Premeditation and deliberation may be established by evidence of (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999) (quotation marks omitted).

Here, there was sufficient circumstantial evidence to support the jury's determination that Knott premeditated and deliberated the victim's murder. Specifically, a reasonable juror could infer from the evidence presented that Knott lured the victim to the house on Ward Street in order to rob and kill him. This inference is supported by evidence that Knott contacted the victim about purchasing marijuana earlier in the day, was the last person to speak with the victim, and turned off his and the victim's cellular telephones shortly after meeting up. Knott's actions before the murder and the fact that he knew the victim are relevant to premeditation. *Id*. Further, the evidence revealed that the victim was shot five times and "[t]he nature and number of a victim's wounds may support a finding of premeditation and deliberation." *Unger*, 278 Mich App at 231. "Specifically, evidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation . . . because the time required to inflict multiple blows affords an assailant sufficient time to . . . take a second look." *Id*. (quotation marks omitted; second ellipsis in original). Therefore, the "circumstances of the killing itself"

also allowed for a reasonable juror to infer that Knott premeditated the victim's murder. *Abraham*, 234 Mich App at 656 (quotation marks omitted).

In sum, the prosecution presented evidence that allowed the jury to infer that Knott intended to kill the victim when he arranged the meeting to purchase marijuana, used that premise to lure the victim to the house on Ward Street, and then shot the victim five times, ultimately killing him. Given Knott's "conduct judged in light of the circumstances," *Oros*, 502 Mich at 244 (quotation marks omitted), the jury was well-supported in finding that Knott had "sufficient time to allow [him] to take a second look," *Jackson*, 292 Mich App at 588 (citations and quotation marks omitted).

## D. SECOND-DEGREE ARSON

Odum separately argues that there was insufficient evidence to convict him of second-degree arson because there was no evidence that the house at 9558 Ward Street was a "dwelling" under the statutory definition. We disagree.

This sufficiency challenge is reviewed de novo. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). When reviewing a claim of insufficient evidence, this Court examines the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the elements of the crime were proven beyond a reasonable doubt. *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019). Appellate review of a challenge to the sufficiency of the evidence is deferential; the reviewing court is required to draw all reasonable inferences and examine credibility issues to support the jury verdict. *Oros*, 502 Mich at 239. When evaluating a challenge to the sufficiency of the evidence, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich 417 at 428. "Jurors are the sole judges of the facts and neither the trial court nor this court can interfere with their exercise of that right." *People v Miller*, 301 Mich 93, 100; 3 NW2d 23 (1942). "It is not the province of the Court to usurp the proper functions of the jury in determining issues of fact." *People v Adams*, 389 Mich 222, 239; 205 NW2d 415 (1973) (citation omitted).

The essence of the right to a jury trial is that the jury becomes the sole judge of all of the facts presented, and it may choose to believe or disbelieve any or all of the evidence. *People v Chamblis*, 395 Mich 408, 420; 236 NW2d 473 (1975), overruled in part on other grounds *People v Cornell*, 466 Mich 35, 357; 646 NW2d 127 (2002). "When [a defendant] exercised his constitutional right to a jury, he put the government to the burden of proving the elements of the crimes charged to a jury's satisfaction, not to ours or to the district judge's." *United States v Howard*, 506 F2d 1131, 1134 (CA 2, 1974).

> What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged . . . and must persuade the factfinder "beyond a reasonable doubt" of the facts necessary to establish each of those

elements . . . . This beyond a reasonable doubt requirement, which was adhered to by virtually all common-law jurisdictions, applies in state as well as federal proceedings.

It is self-evident . . . that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt. [*Sullivan v Louisiana*, 508 US 275, 277-278; 113 S Ct 2078; 124 L Ed 2d 182 (1993).]

Indeed, the jury, in its role as factfinder, has the constitutional responsibility to not only ascertain the facts, but apply the law to those facts and reach the ultimate conclusion of guilt or innocence. *United States v Gaudin*, 515 US 506, 514; 115 S Ct 2310; 132 L Ed 2d 444 (1995).

Once a plea of not guilty is entered, the defendant has an absolute right to a jury determination upon all essential elements of the offense. This right, emanating from the criminal defendant's constitutional right to a trial by jury, is neither depleted nor diminished by what otherwise might be considered the conclusive or compelling nature of the evidence against him. Furthermore, in a situation wherein an understandingly tendered waiver is not forthcoming from the defendant, under no circumstances may the trial court usurp this right by ruling as a matter of law on an essential element of the crime charged.

The trial judge must carefully ensure that there is no trespass on this fundamental right. [*People v Reed*, 393 Mich 342, 349; 224 NW2d 867 (1975) (citation, quotations, and additional punctuation omitted).]

"If the evidence is nearly balanced or is such that different minds would naturally and fairly come to different conclusions, the judge may not disturb the jury findings although his judgment might incline him the other way." *People v Lemmon*, 456 Mich 625, 644; 576 NW2d 129 (1998) (citation and quotations omitted). A judge may not repudiate a jury verdict by acting as the thirteenth juror and substituting his judgment for the jury's determination of questions of fact and credibility. *Id*. at 636-637.[5] Thus, "despite any misgivings or inclinations to disagree" with the decision left where our system has reposed it, judges must not "substitute their views for that of the jury." *Id*. at 646-647. "The trial court's duty to protect the process encompasses a duty to the defendant, to the public, and to the constitutionally guaranteed role of the jury as determiner of disputed facts." *Id*. at 647.

---

[5] Although the *Lemmon* Court addressed a challenge to the great weight of the evidence and the trial court's grant of a new trial in a criminal sexual conduct case where the verdict was contingent on the assessment of credibility, nonetheless, the principles regarding adherence to the divided functions between the judge and the jury provide instruction for the case at bar.

The elements of second-degree arson are governed by MCL 750.73(1): "[A] person who willfully or maliciously burns, damages, or destroys by fire or explosive a dwelling, regardless of whether it is occupied, unoccupied, or vacant at the time of the fire or explosion, or its contents, is guilty of second degree arson." To commit second degree arson, the person need not own the dwelling or its contents. MCL 750.53(2). A "dwelling" is defined to include "but is not limited to, any building, structure, vehicle, watercraft, or trailer adapted for human habitation that was actually lived in or reasonably could have been lived in at the time of the fire . . . ." MCL 750.71(d).

In accordance with the elements of the offense and the definition of dwelling, the trial court instructed the jury that a dwelling house "is a structure that was actually being lived in or that reasonably could have been lived in at the time of the fire." The fire investigator testified that entry to the front door of the home was obstructed by the victim's body. There was smoke throughout the home, and the strong odor of gasoline was present. Two gas cans were found in the kitchen area. The fire investigator identified multiple locations on the first floor of the home where items were burned that included the kitchen, dining room, living room, bedroom, and common hallway. However, he opined that the fire started at or on the victim's body. The fire investigator noted that electricity was not supplied to the home at the time of his inspection. Neighbor Osborne opined that the home was "abandoned," and to his knowledge, there was no one staying in the home. Yet, this neighbor also testified that, for the last ten years, he had resided in the home across the street that had also been "abandoned."

In addition to this testimony, the jury was presented with photographs of the interior of the home after the fire department responded. The photographs of the kitchen, the area where the two gas cans were discovered, depict a complete state of disarray with cabinet drawers strewn about the floor. However, the photographs do not establish whether the condition was in a pre-existing state of disarray or whether responding firefighters created the condition when putting out the fire in that location. Although the living room photograph also depicts items on the floor, there are visible walkways, a couch, and shelving units with trinkets. Furthermore, it is unclear what items were resting on the floor or caused to be placed on the floor in the process of extinguishing the fire.

For purposes of second-degree arson, the prosecutor had to demonstrate to the jury that the malicious burning of a dwelling occurred, and dwelling includes a building that was "actually lived in or reasonably could have been lived in at the time of the fire . . . ." MCL 750.71(d). When the term "reasonable" is not defined in the law, "it is a question of fact for the jury; and the court can not take it from the jury by assuming to decide it as a question of law, without confounding the respective provinces of the court and jury." *Oros*, 502 Mich at 243 n 9 (further citation and quotation omitted).

In light of the testimony from the fire investigator and the photographs, the issue of whether the home constituted "a structure that was actually being lived in or that reasonably could have been lived in at the time of the fire" to satisfy the dwelling requirement of second degree arson presented an issue for resolution by the trier of fact. Indeed, it was an essential element of the offense. Defendant Odum had an absolute right to have the jury render its determination, *Reed*, 393 Mich at 349, and a judge should not disturb this jury finding despite an inclination to reach a different conclusion, *Lemmon*, 456 Mich at 644. The jury was reposed

-12-

with the determination regarding whether this home was actually lived in or reasonably could have been lived in at the time of the fire, and it chose to conclude that the home constituted a dwelling for purposes of second-degree arson. The photographs, no matter how conclusive or compelling to an appellate court, cannot remove the fundamental constitutional right to have the jury render a decision on all essential elements of the offense. *Reed*, 393 Mich at 349. The jury verdict cannot be repudiated by this Court's substitution of its judgment for the jury's determination of questions of fact and application to the law. The fundamental right to a jury trial requires proof of guilt beyond a reasonable doubt of all elements of the offense, and we cannot remove the dwelling issue from the jury's determination in violation of this right. *Sullivan*, 508 US at 277-278. A conclusion to the contrary addresses the dwelling element as a matter of law. Moreover, resolution of this issue solely on the photographs is misplaced. The photographs merely depict the end of the story—the condition of the home following the efforts of firefighters to extinguish a fire. The jury had to decide whether the home reasonably could have been lived in before the fire, and we cannot remove that constitutional delegation of that authority from its purview. Under the circumstances, there was sufficient evidence for the jury to convict both Odum and Knott of second-degree arson.

## III. GREAT WEIGHT OF THE EVIDENCE

Knott argues that all of his convictions were against the great weight of the evidence. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Knott's failure to render a challenge to the great weight of the evidence by making a motion for a new trial on that ground renders this issue unpreserved for our review. *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).

Typically, "[w]e review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). However, "[u]npreserved challenges to the great weight of the evidence are reviewed for plain error affecting the defendant's substantial rights." *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks omitted).

## B. LAW AND ANALYSIS

"A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice

would otherwise result." *Solloway*, 316 Mich App at 182-183 (quotation marks omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Morris*, 314 Mich App 399, 414; 886 NW2d 910 (2016) (quotation marks omitted). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Lacalamita*, 286 Mich App at 469-470 (quotation marks omitted). "[U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Lemmon*, 456 Mich at 645-646 (citation and quotation marks omitted). Thus, "despite any misgivings or inclinations to disagree, [this Court must] leave the test of credibility where our system reposed it—in the trier of the facts." *Id.* at 646 (quotation marks omitted).

Knott's argument regarding the great weight of the evidence mirrors his argument that there was insufficient evidence of his identity as the perpetrator of the crimes. For the same reasons stated in Section II.B.1 of this opinion, Knott's challenge to the great weight of the evidence also fails. In short, the prosecution presented abundant circumstantial evidence of Knott's identity as the perpetrator in this case. To summarize, the prosecution's case established that Knott knew the victim, was in contact with him on the day in question, sought to purchase marijuana from the victim, was the last person to speak with the victim, was in the same area as the victim, had his cellular telephone turned off at the same time as the victim, and purchased gasoline and gas cans at a Citgo gas station near the scene of the crime about 35 minutes before the fire was reported to police. Those gas cans were then found in the kitchen of the house where the victim's body was burned. Proof that Knott was in contact with and in the same area as the victim was evidence that Knott had the opportunity to commit the crimes, which was relevant to his identity as the perpetrator. *Unger*, 278 Mich App at 224.

Knott also lied to police about being in contact with the victim, stating in his interview that he last spoke to the victim in March, when he admitted to Karas in the Facebook conversation that he planned to meet with the victim on the day of the crime, in April. He also lied about being in the area of the scene of the crime on the day in question when he first spoke with police, later admitting that he had been in the area and purchased the gas cans by informing his investigator that the gas cans purchased in the video could be found in a garage owned by his family on Glastonbury Street in Detroit. Proof of those lies was evidence that Knott had a guilty conscience, and thus was relevant to his identity as the perpetrator. *Dixon-Bey*, 321 Mich App at 509-510.

In an attempt to escape this result, Knott argues that the great weight of the evidence actually supported that two other men committed the crimes in question. To substantiate that argument, Knott relies heavily on the fact that Osborne was unable to identify Knott and Odum. Knott suggests that Osborne saw two other men, who Osborne alleged that he later saw at the liquor store near the gas station. Knott argues that Osborne's testimony is supported by the fact that neither Knott's nor Odum's DNA was found at the scene of the crime or on the victim's pocket. However, it is clear from the record that Osborne's testimony was significantly impeached. Specifically, the officer that interviewed Osborne shortly after the crime scene was discovered, acknowledged that Osborne appeared intoxicated at the time of the interview, but

that he was able to understand what was happening. Osborne himself admitted to being "high and half-drunk" when he saw two men at the crime scene and acknowledged that such intoxicants could affect his memory. Indeed, the only thing of which Osborne was certain in his testimony at trial was that he saw two men together at Ward Street, they stayed for about 90 minutes, and once they left, a fire started. As this Court has held, "[c]onflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Lacalamita*, 286 Mich App at 469-470 (quotation marks omitted). At most, Osborne's testimony suggested that it might be two other men that could have committed the crime. Necessarily, though, the decision of what evidence or whose testimony to believe rested with the jury, and the jury determined that, on the basis of the great deal of circumstantial evidence provided, it was Knott and Odum who committed the crimes in question. *Lemmon*, 456 Mich at 645-646.

In sum, the inferences made by the jury to establish Knott's guilt were well-founded, there was abundant circumstantial evidence that supported Knott's identity as the perpetrator of the crimes in question, and we must "leave the test of credibility where our system reposed it—in the trier of the facts." *Id*. at 646 (quotation marks omitted).

## IV. UNAVAILABLE WITNESS

Knott and Odum both argue that they are entitled to a new trial because the trial court abused its discretion and violated their constitutional rights under the Confrontation Clause by determining Covent was unavailable to testify at trial and admitting his preliminary examination testimony. We disagree.

## A. PRESERVATION AND WAIVER

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Similarly, but more generally, "an objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Bulmer*, 256 Mich App 33, 34-35; 662 NW2d 117 (2003). Knott objected when the prosecution moved the trial court to admit the preliminary examination testimony of Covent, arguing that the prosecution had not been duly diligent in obtaining the witness's presence at trial. Knott did not allege a violation of his rights under the Confrontation Clause. The trial court admitted Covent's previous testimony over Knott's objection. Therefore, Knott's challenge to the prosecution's diligence on appeal is preserved, but his constitutional argument under the Confrontation Clause is not. *Id*.

With respect to Odum, however, this issue is waived. "[I]ssues for appeal must be preserved in the record by notation of objection . . . ." *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). A failure to properly object to an issue forfeits that issue, but does not extinguish the error; instead, it allows for plain error review. *Id*. at 215-216; *Carines*, 460 Mich at 763. Waiver, however, occurs when a defendant "affirmatively approve[s]" of an issue before the trial court, only to later argue that there was error on appeal. *People v Jackson*, 313 Mich App 409, 420; 884 NW2d 297 (2015). When waiver occurs, unlike forfeiture, the error is extinguished. *Carter*, 462 Mich at 215.

Here, after the prosecution and Knott argued about due diligence, Odum's trial counsel made the following statement on the record: "On behalf of Mr. Odum, your Honor, I would maintain that the prosecution has maintained—has established unavailability and I would ask the Court to read the exam transcript." As is obvious from that language, Odum did not merely fail to object to the admission of Covent's preliminary examination testimony, but "affirmatively approved" of it, and thus, waived the issue. *Jackson*, 313 Mich App at 420. Consequently, with respect to Odum, any alleged error involving Covent's testimony has been extinguished, and we decline to consider it. *Carter*, 462 Mich at 215.

## B. STANDARD OF REVIEW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143, quoting *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

Typically, when the issue is preserved, "[w]hether a defendant's Sixth Amendment right of confrontation has been violated is a question of constitutional law that this Court reviews de novo." *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018). However, because this issue has not been preserved for review, this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Randolph*, 502 Mich at 10 (quotation marks omitted).

## C. LAW AND ANALYSIS

The trial court did not abuse its discretion by concluding that due diligence was exercised in attempting to locate Covent, and in its admission of Covent's preliminary examination testimony under the circumstances. "A defendant has the right to be confronted with the witnesses against him or her." *Yost*, 278 Mich App at 369-370, citing US Const, Am VI; Const 1963, art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "The purpose of the Confrontation Clause is to provide for a face-to-face confrontation between a defendant and his accusers at trial." *People v Bean*, 457 Mich 677, 682; 580 NW2d 390 (1998) (quotation marks and brackets omitted). "This confrontation is an important right of the defendant because it enables the trier of fact to judge the witnesses' demeanors." *People v Dye*, 431 Mich 58, 64; 427 NW2d 501 (1988) (opinion by LEVIN, J.). "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:

unavailability and a prior opportunity for cross-examination." *Crawford*, 541 US at 68. Included within the definition of "testimonial evidence" is a witness's "prior testimony at a preliminary hearing . . . ." *Id*. Our Supreme Court has held that "the constitutional right to confront one's accusers would not be violated by the use of preliminary examination testimony as substantive evidence at trial only if the prosecution had exercised both due diligence to produce the absent witness and that the testimony bore satisfactory indicia or reliability." *Bean*, 457 Mich at 682-683 (citations omitted).

"Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). "A witness is considered unavailable if he or she is 'absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown.' " *Yost*, 278 Mich App at 370, quoting MRE 804(a)(5). "The test for whether a witness is 'unavailable' as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial." *Bean*, 457 Mich at 684. "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*.

Detective Johnell White testified that he initially was able to serve Covent personally for his appearance at the preliminary examination. However, before the preliminary examination occurred, Covent "ran into some issues in his life," and Detective White had to make contact with Covent through an attorney. Nonetheless, Covent appeared and testified at the preliminary examination. When the prosecutor issued the subpoenas in July for the August 29, 2017 trial date, the detective attempted to contact Covent at his home address, but to no avail. Additionally, he tried all available phone numbers for Covent, but they were out of service. Covent had appeared at the preliminary examination in light of his relationship to the victim's family. Therefore, Detective White sought assistance from the victim's family to locate Covent, but they only "heard" that Covent went to Florida and they did not have an address or phone number for him. Consequently, Detective White reached out to another lawyer who represented Covent in Oakland County for recent drug charges. The detective learned that Covent did not remain in contact with his Oakland County attorney, and a bench warrant was issued for Covent's arrest. Detective White contacted the county prosecutor's office and the task force for information regarding Covent's whereabouts. He also used three different law enforcement tools, but he did not contact other jails or hospitals. He was unable to pursue social media searches because Covent did not appear to have any such accounts. The prosecutor, as an officer of the court, also made a statement on the record of his contacts with Covent's defense attorneys and the Oakland County Prosecutor's Office that corroborated Detective White's testimony. Specifically, after Covent's arrest for drug charges, the prosecutor learned that Covent initially maintained contact with his defense attorneys and appeared in court, but ultimately, a bench warrant was issued for his arrest for nonappearance, and his counsel could not reach him. The trial court found that reasonable efforts were made to secure Covent and allowed the preliminary examination transcript to be read to the jury.

In light of the trial court's factual findings, we cannot conclude that the admission of the preliminary examination transcript constituted an abuse of discretion. In the context of securing witness presence, due diligence means the attempt to do what is reasonable, not all that is possible to obtain the presence of the witness. *People v Eccles*, 260 Mich App 379, 391; 677 NW2d 76 (2004). Under the circumstances presented here, there is no error requiring reversal.

## V. EXPERT WITNESS TESTIMONY

Knott argues that the trial court abused its discretion by denying his motion for a *Daubert*[6] hearing and permitting Agent Brue to testify as an expert in the field of cellular telephone tracking. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"We review a trial court's decision to admit evidence for an abuse of discretion." *People v Muhammad*, 326 Mich App 40, 47; 931 NW2d 20 (2018). "Similarly, a trial court's decision whether to hold an evidentiary hearing is reviewed for an abuse of discretion." *Unger*, 278 Mich App at 216-217. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Courser*, 326 Mich App 298, 305; 926 NW2d 299 (2018). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143, quoting *Lukity*, 460 Mich at 488.

"MRE 702 establishes prerequisites for the admission of expert witness testimony." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). "MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert* . . . in interpreting the equivalent federal rule of evidence." *Muhammad*, 326 Mich App at 51-52, citing *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781-782; 685 NW2d 391 (2004). "The court may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *People v Lane*, 308 Mich App 38, 52; 862 NW2d 446 (2014) (quotation marks and brackets omitted). Scientific experts are not permitted to testify under MRE 702 "unless the trial court first determines that 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue' and the expert witness is 'qualified as an expert by knowledge, skill, experience, training, or education . . . .' " *Yost*, 278 Mich App at 393. When evaluating MRE 702 and *Daubert*, our Supreme Court held that a trial court is required to verify "that the testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *Kowalski*, 492 Mich at 120.

"The purpose of this test is to ensure that a jury is not relying on unproven and ultimately unsound scientific methods." *Lane*, 308 Mich App at 52 (quotation marks omitted). "The

---

[6] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *Unger*, 278 Mich App at 217-218, citing *Daubert*, 509 US at 589-590. For example, "[e]xpert testimony may be excluded when it is based on assumptions that do not comport with the established facts or when it is derived from unreliable and untrustworthy scientific data." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). "An expert's opinion is admissible if it is based on the 'methods and procedures of science' rather than 'subjective belief or unsupported speculation.' " *Unger*, 278 Mich App at 218, quoting *Daubert*, 509 US at 590.

Ultimately, however, the trial court's determination regarding whether it requires a *Daubert* hearing to determine the admissibility of expert testimony is within the trial court's discretion. *Unger*, 278 Mich App at 216-217. As the United States Supreme Court has held, a "trial judge [has] the discretionary authority needed [] to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted . . . ." *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999). "While the exercise of the gatekeeper function is within a court's discretion, the court may neither abandon this obligation nor perform the function inadequately." *Dobek*, 274 Mich App at 94, citing *Gilbert*, 470 Mich at 780.

## B. ANALYSIS

Before trial, Knott moved the trial court to conduct a *Daubert* hearing regarding the reliability and admissibility of Agent Brue's expert testimony addressing cellular telephone tracking. Knott specifically challenged whether Agent Brue's testimony was the product of reliable principles and methods, citing a lack of available certification to be an expert in such science and the lack of peer-reviewed literature on the issue. During the hearing on that motion, the trial court indicated that it had read all the motions, briefs, and Agent Brue's testimony from the preliminary examination. The trial court then held that Agent Brue's proposed testimony was sufficiently reliable and that a *Daubert* hearing was not required. The trial court reasoned that Agent Brue's proposed testimony regarding cellular telephone tracking was commonplace in Michigan courtrooms, the trial court was familiar with Agent Brue's qualifications, and was aware that such testimony has regularly been admitted in this state. As will be clarified herein, the trial court was correct, and therefore, its decision to deny a *Daubert* hearing and to allow Agent Brue's expert testimony was not an abuse of discretion. *Dobek*, 274 Mich App at 94.

Agent Brue testified that he had been employed as a contractor for the Detroit Police Department for $1\frac{1}{2}$ years at the time of his testimony. For the 27 years preceding that position, Agent Brue was employed by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). During his last five years with the ATF, Agent Brue "was responsible for the analysis of historic phone records [and] live time cell phone tracking" for the Detroit Police homicide department. Agent Brue declared that he had significant training and had trained other officers in other states and departments. Before getting to the details of the cellular telephones involved in the present case, Agent Brue explained the data and how it worked. He testified that a cellular telephone, when making a call, usually has between two and four towers to choose from. The cellular telephone will choose the tower on the basis of "signal quality and signal strength." Agent Brue acknowledged that "[i]t's not necessarily always the closest tower, but it's a tower that will be servicing the area that you're staying in." Agent Brue also informed the jury of other

limitations of the technology, stating that the data "provides us an opportunity to make a determination as to the general area that the phone was in during a particular communication event," noting that a cellular telephone might choose a tower farther away if there is high traffic on a closer tower. Typically, however, for a highly-populated city like Detroit, a cellular device will almost always connect to a tower within one mile of the device.

Agent Brue testified that he obtained the cellular telephone data used in his analysis directly from the service providers, such as Sprint or Verizon. The data provided by those companies is limited to information available when a call or text is made. In other words, the records provided by the service providers does not contain information regarding to what tower a cellular telephone is connected unless that cellular telephone is participating in a call or text message. Agent Brue then uses that information and plots the points to create a map. The map only indicates the coverage area of the sector of the tower pinged during each data point. Thus, the map indicated the area the cellular telephone was in at the time in question.

Knott, on appeal, argues that the "principles" and "methodologies" used by Agent Brue are not sufficiently reliable to be admitted. *Kowalski*, 492 Mich at 120. Stated differently, Knott argues that the science behind Agent Brue's testimony is too inexact to be admissible under the standards provided in *Daubert*. The trial court's gatekeeper role, however, is not to determine whether the expert's testimony is *correct*, but just that it relies on reliable principles and methods. See *Unger*, 278 Mich App at 217 (quotation marks omitted) ("[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes."). Here, Knott's arguments address the weight of Agent Brue's testimony and not its admissibility. The trial court in this case, being familiar with Agent Brue, the methods and data supporting his analysis, and his abundant qualifications, properly exercised its "discretionary authority to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted . . . ." *Kumho Tire Co*, 526 US at 152; see also *Kowalski*, 492 Mich at 120. Furthermore, Agent Brue provided abundant information regarding his expertise, the methods used, and how they were applied. Thus, despite the lack of a *Daubert* hearing, there was sufficient evidence on the record to make a determination that the expert's testimony was reliable, and thus, admissible. *Kowalski*, 492 Mich at 120. Knott has not provided any case suggesting that cellular telephone tracking evidence of the type testified by Agent Brue is inadmissible under the requirements of *Daubert*.[7] Thus, we affirm the trial court's decision to admit Agent Brue's testimony without a *Daubert* hearing. *Kumho Tire Co*, 526 US at 152; *Kowalski*, 492 Mich at 120.

---

[7] In fact, the only evidence relied upon by Knott is an article from the ABA Journal, titled "Prosecutors' use of mobile phone tracking is 'junk science,' critics say." However, because that article was not presented to the trial court, we will not consider it on appeal. *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Even so, the article contains no information that is not already established in Agent Brue's own testimony—that the evidence is limited to showing that a cellular telephone likely was in a given area at a given time. Thus, considering that Agent Brue specifically limited his own testimony to what the article established that cellular telephone technology *actually can do*, the article is not beneficial to Knott.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Both Knott and Odum argue that they were denied their constitutional rights to the effective assistance of counsel. We disagree.

### A. STANDARD OF REVIEW AND GENERAL LAW

"Appellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record." *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016). "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016), quoting *People v Brown*, 279 Mich App 116, 140; 755 NW2d 664 (2008).

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *Schrauben*, 314 Mich App at 189-190, citing US Const, Am VI; Const 1963, art 1, § 20. "However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Schrauben*, 314 Mich App at 190. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

This Court will not find trial counsel to be ineffective where an objection would have been futile; nor will it second guess matters of trial strategy. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). "The defendant 'bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim.' " *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015), quoting *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (alteration in *Cooper*).

### B. KNOTT'S ARGUMENTS

Knott first argues that his counsel was ineffective for failing to request and obtain surveillance video from the liquor store across the street from the Citgo gas station. Knott contends that this video would have shown Osborne in the liquor store with two men. Considering Osborne's testimony that he saw two men near the scene of the crime on Ward Street and then again at the liquor store near the Citgo station, the video would have confirmed

that Knott and Odum were not the two men who committed the crimes. Rather, it was the two men in the video at the liquor store. As Knott readily acknowledges, there is no factual predicate for his claim. Specifically, there is no evidence on the record that the liquor store in question has surveillance footage, whether it was or is available, or that the surveillance footage would have shown what Knott contends it would. The burden is on Knott to establish the factual predicate for his claim, which he has failed to do. *Cooper*, 309 Mich App at 80.

Knott also argues that his counsel was ineffective for failing to ensure that portions of Knott's interrogation video—in which he admitted to spending time in prison for previous charges—was not played to the jury. Knott argues that evidence revealing his past prison sentences was improperly admitted under MRE 404(b). Once again, Knott has not presented any proof that the challenged portions actually were played to the jury. Indeed, the record in the case establishes the opposite, with both the prosecution and Knott's attorney acknowledging that the video would be muted or fast forwarded at certain portions. As noted, because this issue is unpreserved our review is limited to "mistakes apparent on the record." *Johnson*, 315 Mich App at 174. Considering the state of the record, as just summarized, Knott has failed to establish the factual predicate for his claim because he is arguing that errors occurred that are not "apparent on the record." *Carbin*, 463 Mich at 600; *Johnson*, 315 Mich App at 174.

Next, Knott argues that his trial counsel was ineffective for failing to object to the cellular telephone logs used by Agent Brue. Knott insists that the cellular telephone records for his telephone were incomplete and would have showed that he spoke to many other people besides the victim and Odum and likely pinged towers not near the crime scene. Once again, Knott has not provided any proof that his telephone logs were incomplete. Knott also failed to present any evidence that even if the logs were incomplete, that the new entries on the log would have been helpful to his case. Thus, because Knott has failed to establish a factual predicate for his claim that trial counsel failed to object to the incomplete nature of the telephone records, Knott's argument on appeal must fail. *Cooper*, 309 Mich App at 80.[8]

## C. ODUM'S ARGUMENT

Odum argues that his trial counsel was ineffective for failing to hire an expert witness to rebut the testimony of Agent Brue. Typically, "[a]n attorney's decision whether to retain

---

[8] In an attempt to support his claim on appeal, Knott presents an affidavit by his appellate counsel. This affidavit does not change our analysis on appeal and does not provide any persuasive support for us to remand for an evidentiary hearing for two reasons. First, our review is limited to the record at trial and an appellant is not permitted to expand the record on appeal. *Nix*, 301 Mich App at 203. Second, the affidavit plainly is hearsay without any exception, and thus would be inadmissible even if produced to the trial court. MRE 801(c); MRE 802. Knott has not provided any explanation why he—who was the person with personal knowledge of all of the claims made in the affidavit—could not have made an affidavit himself. Additionally, we previously denied a motion to remand for an evidentiary hearing by Knott on the basis of that affidavit. *People v Knott*, unpublished order of the Court of Appeals, entered August 10, 2018 (Docket No. 341418).

witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "This Court will not second-guess counsel on matters of trial strategy . . . ." *People v Rosa*, 322 Mich App 726, 742; 913 NW2d 396 (2018) (quotation marks omitted). "The failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012) (brackets omitted). "A substantial defense is one that could have affected the outcome of the trial." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). The Michigan Supreme Court has held that adequate cross-examination of an expert witness, in lieu of calling an expert to rebut the testimony, can constitute valid trial strategy and effective assistance of counsel. *People v LeBlanc*, 465 Mich 575, 580-583; 640 NW2d 246 (2002). Stated differently, constitutionally effective counsel does not require "for every prosecution expert an equal and opposite expert from the defense," because "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington v Richter*, 562 US 86, 111; 131 S Ct 770; 178 L Ed 2d 624 (2011).

In the instant case, Odum's trial counsel decided to cross-examine Agent Brue rather than call a different expert witness to rebut Agent Brue's testimony. During cross-examination at trial, Agent Brue acknowledged that cellular telephone location technology was limited. Specifically, he testified that the tower data only indicates that a person's cellular telephone is likely to be in a specified coverage area. Agent Brue admitted that there could be an overlap in tower coverage, cellular telephones sometimes connected to towers that were not the closest to their location, and anyone could have a person's cellular telephone at any time. In sum, Agent Brue testified regarding the limited value of the cellular telephone technology, in that it only proved for certain that a particular cellular telephone connected to a particular tower sector at a particular time. The data could not place Odum at the crime scene because someone else might have had Odum's telephone, the cellular telephone might have connected to a more-distant tower, and the cellular telephone could be anywhere within the coverage area, which just happened to contain the crime scene.

Odum argues that an expert would have testified that cellular telephone tower information was unreliable and could not place Odum at the crime scene. However, the cross-examination of Agent Brue by Odum's trial counsel already established those facts by requiring Agent Brue to admit to the limitations of his analysis on the basis of the data. As this Court and the Michigan Supreme Court have held, trial counsel's decision to cross-examine an expert witness instead of calling a rebuttal expert witness is presumed to be a valid trial strategy. *Id.*; *Payne*, 285 Mich App at 190. Here, the trial strategy certainly was valid because it is reasonable to assume that an expert witness admitting the limitations of his own data would be more powerful than calling another expert witness to testify concerning the same facts. See *Harrington*, 562 US at 111 ("When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict."). Thus, Odum has failed to meet his burden to overcome the presumption that his trial counsel's strategy was reasonable under the circumstances, and has provided no evidence that trial counsel's failure to call an expert witness denied him a substantial defense. *LeBlanc*, 465 Mich at 580-583; *Russell*, 297 Mich App at 716; *Payne*, 285 Mich App a7 190.

## VII. PHOTOGRAPHIC EVIDENCE

Odum argues that he is entitled to a new trial because the trial court abused its discretion by refusing to exclude, what he contends to be, a gruesome crime scene photograph. We disagree.

## A. STANDARD OF REVIEW AND GENERAL LAW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *Chelmicki*, 305 Mich App at 62. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Courser*, 326 Mich App at 305. "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143, quoting *Lukity*, 460 Mich at 488.

Generally, "[a]ll relevant evidence is admissible[.]" MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even where evidence is considered to be relevant, the evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[a]ll relevant and material evidence is prejudicial." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). There is, therefore, a two-part test: "First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks omitted).

" 'Photographic evidence is generally admissible as long as it is relevant, MRE 401, and not unduly prejudicial, MRE 403.' " *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2018), quoting *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009). "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Mills*, 450 Mich at 76. "Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions." *Id*. at 66-67 (quotation marks omitted). Gruesomeness alone will not result in the exclusion of the photograph, and photographs depicting the nature and extent of a victim's injuries are probative of the defendant's mental state. *People v Head*, 323 Mich App 526, 541; 917 NW2d 752 (2018). For preserved nonconsitutional evidentiary issues, "it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *Jackson*, 498 Mich at 259. Plus, to the extent Odum has made a constitutional claim, it is unpreserved, and therefore requires proof that the error affected his substantial rights via "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

## B. ANALYSIS

The trial court did not abuse its discretion in admitting the challenged photograph. The photograph challenged by Odum on appeal is a closeup of the victim's face. The photograph shows that the victim's face is covered in blood and the portion of the floor under him also is covered in blood. However, other photographs were admitted that depicted blood, gore, and burns on the victim. The photograph contested by defendant was admitted for a proper purpose, to show the nature and extent of the victim's injuries, and it was probative of the mental state that the prosecutor was required to prove. *Head*, 323 Mich App at 541. Accordingly, this claim of error does not entitle Odum to appellate relief.

## VIII. IMPARTIAL JURY

Odum argues that his constitutional right to an impartial jury was violated when the trial court refused to strike three jurors who perceived a threat from Odum's relatives. We disagree.

### A. STANDARD OF REVIEW AND GENERAL LAW

"Whether defendant was denied his [constitutional] right to an impartial jury . . . is a constitutional question that we review de novo." *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). "This Court reviews for an abuse of discretion the trial court's decision to deny a defendant's motion for a mistrial." *Lane*, 308 Mich App at 60. "An abuse of discretion occurs only when the trial court chooses an outcome falling outside [the] principled range of outcomes." *People v Miller*, 482 Mich 540, 558; 759 NW2d 850 (2008) (alteration in original; quotation marks omitted).

"[A] criminal defendant has a constitutional right to be tried by an impartial jury . . . ." *Id*. at 547, citing US Const, Am VI; Const 1963, art 1, § 20. "However, it is well established that not every instance of misconduct in a juror will require a new trial." *People v Nick*, 360 Mich 219, 230; 103 NW2d 435 (1960) (quotation marks omitted). "The general principal underlying the cases is that the misconduct must be such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment." *Id*. (quotation marks omitted). In other words, defendants complaining of an impartial jury are " 'not entitled to a new trial unless the juror's [alleged misconduct or bias] denied [the defendants] their right to an impartial jury.' " *Miller*, 482 Mich at 548-549, quoting *McDonough Power Equip, Inc v Greenwood*, 464 US 548, 549; 104 S Ct 845; 78 L Ed 2d 663 (1984). "[T]he general rule" is that "a verdict in a criminal case should not be upset because of alleged misconduct on the part of members of the jury unless 'substantial harm' has resulted . . . ." *Nick*, 360 Mich at 230. "However . . . jurors are 'presumed to be . . . impartial, until the contrary is shown.' " *Miller*, 482 Mich at 550, quoting *Holt v People*, 13 Mich 224, 228 (1865). Thus, "[t]he burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Miller*, 482 Mich at 550. Similarly, "[a] trial court should grant a mistrial only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

### B. ANALYSIS

Odum argues that the trial court should have stricken the three jurors in question—SM, JB, and JD—or granted his motion for a mistrial. The record reveals that SM was contacted by

someone with whom she worked, Loretta, asking about the case against Odum. Loretta noted that the boyfriend of Odum's sister worked at the same place of employment. The following day, SM informed JB and JD that someone had contacted her about the case. After that day of testimony, she asked them to walk her to her car. JB and JD, when questioned by the trial court, noted that they understood that SM was concerned about her safety given that she had been contacted by someone associated with Odum. SM informed the trial court that she was not threatened in her contact with Loretta. When the court did not hold trial on a Friday, SM went to work where she was approached in person by Loretta. Loretta once again attempted to engage SM in conversation. SM declined to speak about the case against Odum. Once again, SM explained that she did not feel threatened. When prompted by the trial court, all three jurors stated that they would not consider the contact when deciding the case and that they would remain impartial.

Odum has not met his burden "to establish that the juror[s] [were] not impartial or at least that the juror[s'] impartiality is in reasonable doubt." *Miller*, 482 Mich at 550. First, with regard to SM, Odum's argument is entirely without merit because SM was dismissed as the alternate juror before deliberations began. Therefore, even if there was evidence that SM was biased in some manner, that bias could not have affected impartiality of the jury as a whole because she never engaged in deliberations. *Id.* For that same reason, the trial court's refusal to grant a mistrial because of SM's contact with Loretta was not an abuse of discretion because Odum failed to provide any proof of an "irregularity that [was] prejudicial to [his] rights . . . and impair[ed] his ability to get a fair trial." *Schaw*, 288 Mich App at 236.

Second, with regard to JB and JD, Odum simply has failed to present any evidence that those two jurors somehow developed a bias against Odum. Odum did not provide any affidavits on appeal or before the trial court regarding feelings of prejudice incurred by JB and JD because of their interaction with SM. Instead, the only evidence on the record was the statements of JB and JD that they could continue to be impartial. We must presume that JB and JD were impartial until proven otherwise. *Miller*, 482 Mich at 550. Further, the trial court instructed both JB and JD that they were "to decide this case based solely on the testimony and exhibits that come from the witness stand," and to put aside any information regarding SM's contact from Loretta. "Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *People v Mullins*, 322 Mich App 151, 173; 911 NW2d 201 (2017). Thus, considering the presumption of impartiality, the utter lack of evidence of any bias by JB and JD, and the presumption that the jurors followed the trial court's instructions, we find no error in the trial court's order denying Odum's motion to strike JB and JD or to declare a mistrial. *Miller*, 482 Mich at 550; *Mullins*, 322 Mich App at 173; *Schaw*, 288 Mich App at 236.

## IX. CONSECUTIVE SENTENCE

Odum argues that the trial court erred when it ordered him to serve his felony-firearm sentence consecutively to all of his other sentences. We agree.

## A. PRESERVATION AND STANDARD OF REVIEW

"To preserve a sentencing issue for appeal, a defendant must raise the issue 'at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the

court of appeals.' " *People v Clark*, 315 Mich App 219, 223; 888 NW2d 309 (2016), quoting MCR 6.429(C). Odum did not comply with that rule of preservation. When the issue is preserved, "whether a trial court may impose consecutive sentences is a question of statutory interpretation, which is reviewed de novo." *Clark*, 315 Mich App at 224. However, with respect to sentencing challenges, "[t]his Court reviews unpreserved claims of error under the plain error rule." *People v Foster*, 319 Mich App 365, 371; 901 NW2d 127 (2017). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

## B. LAW AND ANALYSIS

"In Michigan, concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *People v DeLeon*, 317 Mich App 714, 721; 895 NW2d 577 (2016) (quotation marks omitted). Under MCL 750.227b(3), a sentence for felony-firearm "shall be served consecutively with and preceding any term of imprisonment imposed for the conviction of the felony or attempt to commit the felony." The Michigan Supreme Court has held that, "[f]rom the plain language of the felony-firearm statute, it is evident that the Legislature intended that a felony-firearm sentence be consecutive only to the sentence for a specific underlying felony." *People v Clark*, 463 Mich 459, 463; 619 NW2d 538 (2000) (citation omitted). "No language in the statute permits consecutive sentencing with convictions other than the predicate offense." *Id*. at 464.

As noted, Odum was charged and convicted of felony-firearm and sentenced to serve his two years' imprisonment consecutively to all of his other sentences. The felony information listed the following predicate crimes for the felony-firearm charge against Odum: "murder first degree and/or felony murder and/or robbery armed and/or felon in possession of a firearm[.]" Of those four listed predicate felonies, Odum only was convicted of first-degree felony murder and armed robbery. Notably, as agreed by Odum and the prosecution, second-degree arson and mutilation of a dead body were not listed as predicate offenses for the felony-firearm charge. Thus, the trial court erred by sentencing Odum to serve his felony-firearm sentence consecutively to those two charges. *Id*. at 463-464.

Moreover, despite the apparent agreement by the parties, the trial court also erred in sentencing Odum to serve the felony-firearm sentence consecutive to more than one of the sentences for the underlying felonies listed in the felony information. We recently held that the plain language of MCL 750.227b(3) requires that "[a] felony-firearm sentence must [] be served consecutive with the sentence for *the one* predicate felony." *People v Coleman*, 327 Mich App 430, 441-442; ___ NW2d ___ (2019) (emphasis added). Under *Coleman*, which is binding and dispositive of this issue, because only one count of felony-firearm was charged, Odum can only be ordered to serve his sentence for that conviction consecutive to *one* of the charged underlying felonies of which he was convicted. *Id*. Consequently, we now remand to the trial court for correction of that error.

## X. CONCLUSION

Affirmed but remanded to the trial court for the limited purpose of entering amended judgments of sentence clarifying the underlying felony for which Odum must serve his consecutive sentence, and that Knott has one conviction and sentence for first-degree murder based on two theories. We do not retain jurisdiction.

/s/ Kirsten Frank Kelly
/s/ James Robert Redford